Case number 21-1283 from the District of North Dakota, United States v. Fredrick Davis. Delorme. May it please the Court. Ms. Quinn, Madam Clerk, my name is Gary Delorme. I'm an assistant United States attorney in Bismarck, North Dakota, and I represent the United States in the manner now before the Court. I've reserved three minutes for rebuttal in this particular argument, so I'm going to try to watch the clock as best I can, Your Honors. This matter is an affirmative appeal in which the United States is asking this Court to ultimately remand the case back to the district court for resentencing with instructions to consider all the relevant sentencing factors to include punishment and deterrence, both general and specific. Ultimately, the totality of circumstances is what the Court needs to look at in this particular case in that you have the facts underlying the crime, and then you have the factors that the Court relied upon in issuing its sentence or imposing its time-served sentence in this particular matter. The relevant facts in this case is Mr. Davis was a retired Marine, had 21 years of service. He was out of the Marines for some 15 or 16 years before committing this particular crime. He resided in Colorado, and he used several applications online to communicate with two females, or what he believed to be two minor females, 14-year-old females living in Dickinson, North Dakota. He used the applications scout.com and meetme.com to reach out and friend these particular individuals. Of course, unknowing to Mr. Davis is that he had the unfortunate luck of discovering two undercover officers, one that worked for the Dickinson Police Department, and one that worked for the Stark County Sheriff's Office, which Dickinson is the main city seat for that county. Mr. Davis, after friending these two individuals, received communication from them indicating that they were 14 years of age. They talked about their school being in a certain grade. And that's important to note in cases like this because a lot of these social networking sites, they require people to be 18 when they sign up for them. So the only thing that those sites ask for, though, is for the individual to click a button that says, yes, I am 18. They don't confirm it. They don't ask for anything else. They don't ask for identification. Mr. Davis, after having learned of this information, turned the conversations to a very sexual nature. He talked with them about sexual acts that they performed in the past, sexual acts that he liked to perform with them. Once he realized, and this was after the officers deconflicted and realized they were talking to the same individual, once he realized that they were friends going to the same school in the same town, the conversation then turned to sexual acts with all three of them meeting at some particular point in time. During these communications, Mr. Davis sent multiple pictures of his penis to each of the two minors that he believed were 14-year-olds. He actually did travel from Colorado to Dickinson, North Dakota, going several hundred miles. He had a hotel room that he indicated he would meet them at. And he was specifically requested, and this is something that we do in these particular cases, we have the personas ask for something to be brought with them so that it's further intent of what they want to do. In this particular case, it was candy bars and a unicorn. I think it was Butterfingers. Mr. Davis did stop at a store prior to going to the hotel, picked up the candy, picked up the unicorn. And, of course, when he arrived there, he was arrested by the officers. In his meeting with the officers, he did indicate that he never intended to actually have any kind of sexual acts with the minors himself, but he would have probably watched them performing acts on each other while he was there. He was charged ultimately with two counts. Count one was coercion, enticement of a minor under 18 U.S.C. 2422 subsection B, which comes with a mandatory minimum of 10 years. He was also charged with, and this is both attempt counts, he was also charged with attempt to transfer obscene material to a minor under 16 years of age. And that was based upon the penis pictures that he sent. During negotiations with the Federal Public Defender's Office, one of the things we discussed, and we made that quite clear in both the change of plea and the sentencing hearing, is that Mr. Davis had no prior history. He did have the 21 years of military service. He was retired. And taking that into account, the parties entered into a plea agreement where the charge to 18 U.S.C. 2422 subsection A, which does not have a mandatory minimum in it. As part of the plea agreement, both parties agreed to jointly recommend a 60-month term of imprisonment for Mr. Davis for his conduct. At sentencing, both parties did indicate that we were recommending 60 months. So the Federal Public Defender's Office, they did abide by the plea agreement in this particular matter. The court's response, they determined to impose a departure of variance down to a time served. In this particular case, what we get to here is the facts, factors that the court relied upon. Because it appears from the record the court relied almost solely on the 21 years of service and a prior lack of criminal history. Well, you omitted the non-incarcerative part of the sentence. Was that, yeah? You omitted, again, as in your brief, the parts of the sentence that were not the non-incarcerative parts. Oh, the 12 months. Ten years of supervised release, 12 months of home confinement with psychological counseling and or sex offender treatment and sex offender registration, which is quite serious. We keep hearing from them. Well, yeah. So that's, just to say you got a two-month sentence is seriously understating what the court imposed. Well, if you look at the 12 months of home confinement, Your Honor, essentially what the court is doing is putting him in the same position that he was in when he committed the crime. He was at home. He was at home using a device. So in home confinement, it is not such a punishment. He gets to work. He gets to leave work. He can run and do errands. He can run and pick up groceries. There's nothing that confines him. The punishment value is really he's got to be home from probably 10 a.m. to 6 or 10 p.m. to 6 a.m. to 1. Counsel, is your argument head on into the language of Gohl about the offenders? They say the pro they use the term probation, but they said subject to conditions that substantially restrict, and I bet you know the language in Gohl. Is your position almost a frontal attack on the Gohl case? Not entirely, Your Honor. Well, you know what? I hadn't, to your case, I hadn't looked at the details of the actual sentence in Gohl. Have you looked at the details of the actual sentence in Gohl? I did not, Your Honor. Well, because it, of course, the government wanted 30 to 37 months in prison, and he got probation for 36 months. And that was the issue at the lower levels of the case before they used it to establish other rules, too. But how head on are we just into the Gohl case itself, which originated this circuit? Your Honor, when I'm talking about Gohl, Gohl set out a number of things for courts to consider. You know, one of the things is, you know, as Davis argues in his brief, is the fact that courts are not going to have some sort of strict mathematical type of calculation as far as how you weigh specific factors. What Gohl does say, though, is that it's unequivocal that a substantial departure should be supported by more than just a minor factor. And in this particular case, Your Honor, I'm indicating to the Court that I'm happy that Mr. Davis had 21 years of Marine Corps service. And I'm not speaking lightly about that, Your Honors. I'm a retired individual myself. I did 21 and a half years between the Guard and the Army, had a couple deployments. I do not believe I deserve a get-out-of-jail-free card just based on that fact myself, given the facts of this particular case. You can't be a witness here, counsel. Go ahead. Right. Based on the factors of this case, Your Honor, I think when you look at this individual who, his intent, his intent in his mind, he traveled with the intent to have sex with two 14-year-old females in North Dakota, that is a very significant crime. The fact that we had new undercover officers online shouldn't play any part into it. And I think part of that is baked into this cake here with the Court's imposition of the time-served sentence. But when you look at it, does the fact that he had no criminal history prior to that, and the fact that he was 21 years of service in the Marines, does that really amount to a time-served sentence in this particular case? When you look at the deterrent factors that I'm asking the Court to consider, you look at the numbers from 2019 and 2020. It was 37,000, I think, computer learning crimes in 2019. 39,000, I believe, in 2020. 97.5% increase over those two years, according to statistics. Is it legitimate under Gall for a district court to have a policy disagreement with the government's use of undercover posers to induce these kinds of crimes? I don't believe so, Your Honor. I said, doesn't Gall allow that? Just like it allows policy disagreements with the child sex 2G2 guidelines enhancements? I understand your question now, Your Honor. What do we do with that? I mean, Gall told us, get away from that, Gall and Rita and so forth. But are we going to have cases from here down the line where we're going to have a Fine, but we've been dealt out of it by the Supreme Court. Well, not necessarily, because in Feimster, you guys gave yourself three particular factors that you could look at in remanding the case. And one of them is to consider relevant factors that should receive significant weight. Deterrents in this particular matter and punishment are significant factors. You're aware of the conclusion of that case? I am, Your Honor. It will be a rare case. I am, Your Honor. You don't have to ask the court to determine that this is a rare case. You also gave yourself significant weight to an improper rule? Your reply brief was very interesting. It says 13 District of North Dakota sex trafficking cases where defendant pled to reduce charges and got prison time. My reaction is it looks like you're generally overcharging these offenses. At least if I was a district judge, I might come to that conclusion. And Gall says I'm entitled, I have the discretion to do that. Well, Your Honor, overcharging is not part of this equation here. But if you want to talk about those particular cases, 2422 subsection B is the actual. It's one of the factors that a district court is entitled under Gall and Reed to consider relevant. Absolutely. But it's not an overcharging, Your Honor. That is the charge. What are we supposed to do? That was an irrelevant factor when Gall says there's basically no such thing? Well, what I'm asking, Your Honor, is you look at the factors that the court relied upon. And really, the court only replied on those two factors. The fact that the court's only rationale was, well, I'm not going to put a law-abiding individual in court and otherwise law-abiding individual in prison for 60 months. And unlikely to reoffend. And that is an issue itself, Your Honor. PICRA is never meant to have been used as a tool, as a sentencing tool in court. What did you say? PICRA. He based that on the PICRA, which is the pre-trial services. The PSR author creates this tool. They have a tool where they determine the recidivism rate of an individual. They only use that. And it was only meant to be used for the person when they come out of prison and what services. What circuit court or Supreme Court case says that? I mean, you want us to be a surrogate trial court. I'm not asking you to do that, Your Honor. I'm asking you to look at the court. I just recited something that I think, unlikely to reoffend, I've seen as a relevant factor in darn near every sentencing appeal I've had since the guidelines. That is not based on any scientific tools, Your Honor. PICRA is not a scientific tool. It doesn't have to be. And it has no effect at all on a sexual offender. There is other design tools. You assert that. Did you have an expert in sentencing? No, Your Honor. What I'm basing that on is the court actually referred to PICRA when he referred to not likely to reoffend. And that was never what was meant for this particular tool. It was meant to be for rehabilitative purposes. Counsel, you didn't have an expert say what you're saying. There's nothing we can look at in the record to say what you're saying, right? Other than you have to assume that that's what the court was looking at as PICRA, because PICRA in the PSR said that he was a low level to reoffend. But that's not based upon any of the sex offending characteristics of the case. So it was improper. I guess no criminal history suggests he's not a repeat offender. No criminal history, Your Honor, is also taken into consideration in the guidelines. You know, it's not another tool to be looked at. You're making defense counsel's favorite argument in sentencing appeals that we reject every time. Considering the factors here, Your Honor, I think this is one of those unique cases. I want to just say real quickly, I'm not running away from Red Cloud that was raised in Davis brief. I think Red Cloud was actually a good example of this court looking at the case. In Red Cloud, that particular court actually provided significant analysis and rationale for the sentence imposed and had very significant factors that the court relied upon in imposing that particular sentence, that being the mental diagnosis of the defendant in that particular matter. But I'd go ahead and reserve some time, Your Honors. But I see my time is up. Thank you for allowing me time to argue. Quinn. Good morning. May it please the Court. My name is Molly Quinn. I represent the appellee, Frederick Miles Davis.  The sentence of time served with 10 years of supervised release was a substantively reasonable sentence, and the district court was well within its broad discretion to impose that sentence under the facts of this case. The record shows that the district court here carefully considered the 3553A factors, the entire sentencing record before it, addressed many of the 3553A factors explicitly and carefully on the record and carefully crafted the sentence in this case. The district court gave four main reasons for imposing a below prison guideline range sentence in this case, Mr. Davis' complete lack of criminal history, his 21 years of military service with commendations, his deep remorse for his conduct, and his unlikelihood to reoffend. And these factors more than justify the district court's selection of a sentence in this case. I'd like to start with the lengthy term of supervised release that the district court did impose. Judge Benton, I believe you brought up Gall. I think it is quite striking to look back fresh at the facts of Gall and the sentence that was imposed in that case, and it does kind of number-wise bear resemblance to this case. But more importantly — No home confinement. It was on the panel and got reversed. We all remember that, I imagine. Gall made clear that particularly in cases with a relatively low guideline range where there's basically a noncustodial sentence, here it is, a little over two months of time served, that just looking at the difference between the prison guideline range and the sentence that's imposed completely overlooks the substantial restrictions of freedom associated with probation or supervised release. Well, go slowly. In Gall, there's no home confinement, right? That's right. Okay. In Gall, there's a strict reporting regime, three-year regime of alcohol and drug testing and probation for 36 months. Correct. And that's all — am I accurately summarizing the sentence there? From my recollection, yes, you are. So how does that compare to here? I hate to use the word lenient because I think Gall is telling us let's not consider probation lenient, that it is quite invasive. The court says that. Go ahead. The sentence is, here the term of supervision is much longer, 10 years of supervised release, and this is double or five years longer than the statutory mandatory minimum. The term of supervised release that was part of the joint recommendation in the plea agreement, that was just five years, and the bottom of the guideline range, which again was five years. So this is a very — if you're the one living it, 10 years is a very long time for a person to be or supervised release here. And the conditions in Gall or that are cited by the court in Gall are all part of the kind of standard or mandatory conditions of supervised release here. And Mr. Davis has a number of special conditions, they call them, really specific conditions for him. Isn't the key to this case the fact that there was — I hate to use the analogy no harm, no foul? Suppose he had actually ended up in that motel with his two young girls. What would the sentence have been then? I think that — I don't know what the sentence would have been. No. No. And maybe it's not a fair question, but let's be realistic about this. I think — Isn't this another case in which — I think it might — I shouldn't say another case, but what Judge Colton said in his concurrence in the Feimster case, there are cases in which the sentence will substantially depend on the luck of the judicial draw. In other words, I think of the district courts around the — within this circuit, I mean, would never give a sentence like this. And I guess that's not a consideration. We don't compare judges, I guess. We look at the facts. That's right. And the facts here are not as — because nothing actually happened, there were no victims as such. And I think the district court here did fully consider all the facts and circumstances of the offense, which included the fact that Mr. Davis had no way of knowing that these were undercover officers. And the district court — We have a lot of cases that say that doesn't matter. You're a defense — experienced defense counsel. You know that. Very much so. You know, you can say all you want about whether — comparing the sentences in Gaul and here. The fact is the offender in Gaul was far more outrageous than this. Both the offense and the prior and subsequent conduct were atrocious. And the history. Go ahead. Thank you. I would like to get back to your question, Judge Woolman. You got reversed. I think — I think that we have — there's been a lot of different cases that are cited here of sentences that are imposed. And I think that we were able to find at least two that we're aware of. We don't have great data. Where people in the District of North Dakota did, under similar circumstances — and every case is obviously highly individualistic, that's the entire point of Gaul — that people did get time-served sentences for the same, I guess, offensive conviction. The time was longer than two months, though, in those cases, right? You know, I can't — off the top of my head, I can't say. It was. Now, the statutory maximum by the time we're done was 20 years, right? Correct. Okay. So would you be making the same argument if he got 20 years in prison? If — I guess I wouldn't be here as the affilee defending a sentence. I'm not sure I'm understanding the question. Well, the question is simple. If you were the counsel for him, would you think it violates Gaul if he got 20 years? I think that — I don't know if I could say violates Gaul. I think that we would — if the defendant wanted to, we would come and we would present our best argument that there was a substantively unreasonable sentence. We would try to find a way — I know it's not a requirement, but some language that appears in concurrences — that that's a sentence that shocks the conscience under the facts of these cases. And, frankly, I would expect this Court to politely affirm a 20-year sentence. Thank you. I want to — before I kind of get back to Mr. Davis's personal history and characteristics, I do want to highlight some of those conditions and clarify the conditions of supervised release. The 12 months of home confinement was — I guess I disagree that that's not a serious condition or a serious infringement on liberty. This is different than the conditions that Mr. Davis was on pre-trial. That was — they called it a curfew. So that's where he was limited to his house from, I believe, 8 p.m. to 5 a.m. And this is full-on 12 months of home confinement where a person would have to get to the store, is allowed to continue to — Is it monitored GPS or ankle bracelet or whatever the technology is these days? Do you know, counsel? You know, I don't know that off the top of my head. I do apologize. He was monitored. They used — I remember it because they had to change it to radio monitoring for pre-trial supervision. And I didn't bring the judgment up with me to know whether he — You read my mind. — whether it's a condition. I think it would be certainly authorized. You read my mind to see what it really says. Go ahead. And I don't know that it would — even if it doesn't appear in the judgment, that's certainly something that probation could do as part of home confinement. The conditions included sex offender treatment, including a specific psychosexual evaluation. The judgment explicitly allows that to be inpatient treatment if necessary. Again, an even greater infringement on liberty includes polygraphs and other forms of testing. The special conditions included complying with — Counsel, it does say without any form of electronic monitoring. It does. You are required to remain in your home without any use of electronic monitoring. That wasn't in your briefs, was it, either side? No, I don't believe that I thought about that question. But restricted home, clearly. Yes. Except for the four or five categories. And, of course, those pre-approved by the probation officer. Go ahead. Thank you. Before I move on, just there are pretty stringent employment restrictions, housing restrictions, socialization restrictions, all of which prevent Mr. Davis from coming into contact with people under the age of 18. Internet, computer, those types of restrictions that he has to get pre-approval from probation, backed up by warrantless searches, and potential placement at any time during this entire 10-year period in a residential reentry center. So this is not a 10 years where Mr. Davis can run around and do whatever he wants. He also, as a requirement of the sex offender registration system, that would require him to register, obviously update his registration, and then there are limitations on where people who qualify for that can stay as well. So he is living under very restrictive conditions. Gall made clear that this is a significant portion of punishment, that this is a significant portion of the sentence that the court needs to look at and not just the degree of a variance or the percentage of a variance from the guideline range to the custodial sentence. I'd like to focus in on the factors that the district court did give great weight to. Mr. Davis' complete lack of criminal history. This isn't just somebody who came in in criminal history category one. I think that category can cover a broad range of people, depending on the age of prior convictions, arrests that were dismissed, that type of thing. Mr. Davis comes in with a completely clean record.  Was it available? I don't know if it was available or not available. It is a federal court record. They have federal courts, you may know, and they also have all other levels of punishment and records. Was his military record before the court or not? In the old days, it was a hard copy record. Go ahead. There is one military record at document 42-1, and I am not a veteran, so I don't know what that is, if that's a discharge summary. How many pages is it? It is, I believe, two pages. Okay. So it wouldn't be the entire record. No, it's not a disciplinary record. It does list all of Mr. Davis' commendations. His employment record is not violent, but he lost several jobs because of his disagreement with his supervisors. He did. I guess that's human nature and, I mean, part of his human nature. Maybe that's because he had been in the Marines. He was not accustomed to being ordered about by some supervisor. The other hand of that is, if you're in the Marines, you obey your money. But it was an interesting employment history. I guess I would agree Mr. Davis doesn't come in as a complete saint. I have to agree with that. I would cite Mr. Davis' military service in answer to that question and also as an independent reason for the sentence, that this is a person who served a long time in multiple combat situations, developed service-related post-traumatic stress disorder. I don't know one way or another whether that affects his ability to interact with employers in those years after his service. But this is somebody who, by his own words, he said, you know, I lost my humanity. And he didn't start to feel like he got that back until he took the initiative to get counseling through the VA after this case. And I just want to address the military service factor. There's no requirement that a person have an extraordinary military record for the district court to consider that and give it great weight in balancing the 3553A factors. I think for the reasons that I've already said, Mr. Davis actually did have an extraordinary record. We talked about how long he served. He did see combat in multiple different conflicts, starting in Somalia in the 1990s. We don't have a ton of detail on that, but we do know that that was pretty traumatic for him. He spoke about that. We know that he did receive fire, that he served under fire. He received the combat action ribbon for that, as well as a number of other commendations that the district court noted and that are in that document 42-1 that we already talked about. And, again, this military service was at great price. Mr. Davis developed service-related post-traumatic stress disorder that he suffered with without treatment for a number of years. I'd like to address the fourth thing the district court cited first, which is Mr. Davis' unlikelihood to re-offend. And there's some discussion here today and in the briefs about this risk assessment tool in the pre-sentence investigation report. And I think that the district court's finding that Mr. Davis is at low likelihood to re-offend can be and is based on more than that risk assessment tool. I went back to the Supreme Court's Pepper case, and that's in the post-remand context. But it's analogous here, at least, that a likelihood of recidivism is something that the district court should be considering and can look at post-sentencing rehabilitation. And that would be analogous to the situation here of looking at somebody's entire life leading up to that point without necessarily a risk assessment tool and whether it assesses the exact type of conduct here and whether it's something that kind of has developed as whether the tool itself is something that's used to assess recidivism. But the Supreme Court case law says the court can look at the whole picture and make that determination. But, counsel, the PSR does have the disclaimer about it's not really supposed to be used for sexual offenders, right? It does have that, yes. And the district court was aware of that. And that's right in the PSR. Yes. Proceed. The district court can look at, and I think he did find that this is he didn't use the words out of character. He said this is not part of, I believe, the nature and history of Mr. Davis. But the district court looked at the whole picture of the person in front of him and said, I don't think this is who this guy is. And the district court is allowed to do that. The district court found that he had deep and genuine remorse. And the district court, again, is best positioned to assess Mr. Davis' demeanor when he appeared in front of him in court. And he expressed his remorse multiple times, but he did, I think, most notably when he was asked, what are we here for today? And I think the answer was supposed to be for change of plea in sentencing. And Mr. Davis said, because I did something very stupid, Your Honor. So the district court could look at Mr. Davis' demeanor and say, yes, I believe this is genuine remorse. The district court could look at Mr. Davis' success on pretrial release for 12 months under stringent conditions, some more stringent, some less stringent than the term of supervision, and say, he did really well. That helps me understand this man is unlikely to reoffend. Mr. Davis took initiative to get the counseling that he needed for his post-traumatic stress disorder. All of that can be baked into the district court's determination that this person is unlikely to reoffend and that the most appropriate sentence in this case would be a lengthy term of supervised release under restrictive conditions that are specifically designed to address his conduct, the harm it did cause and could have caused to society, what Mr. Davis needs, and what would best protect the community going forward. This is more of an observation and not a question, isn't it? I'll put it in the form of a question. Isn't it more than passing strange that the district court would have departed so much below what defense counsel was agreeable to? Maybe defense counsel was assuming that the judge would do like other district judges in North Dakota have done and would do. But there again, that's not a legal standard, but just an observation for what little it may add, if anything. The court might have figured that that agreement was needed to get a deal at all. I think in a situation where there are mandatory minimums that totally remove the district court's discretion to take a look at a person that they find sympathetic, I think district courts understand that that's sometimes where these types of plea agreements come from. Again, there's a risk that the district court will reject a joint recommendation and both sides take that risk. Defendants frequently take that risk, much to their detriment. We would ask the court to affirm. Thank you so much. Thank you, counsel. Is there any rebuttal time? I think we understand the issues and it's been thoroughly briefed and well-argued. They're always unusual, aren't they? We'll take it under advisement.